COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Malveaux and Senior Judge Frank

UNPUBLISHED

CHARLES RYAN LYNN

v.      Record No. 0954-19-3

CAMPBELL COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
JANUARY 7, 2020

FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

(Grady W. Donaldson, Jr.; Schenkel & Donaldson, PC, on brief), for
appellant.

(David W. Shreve; George W. Nolley, Guardian *ad litem* for the
minor child, on brief), for appellee.

Charles Ryan Lynn (father) appeals the circuit court order terminating his parental rights to

his child, T.L. Father argues that the circuit court erred by finding that the evidence was sufficient

to terminate his parental rights under Code § 16.1-283(B) and (C)(2). Upon reviewing the record

and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we

summarily affirm the decision of the circuit court. See Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Father and September R. Lynn (mother) are the biological parents to T.L.[2] From 2012 through 2017, the Campbell County Department of Social Services (the Department) received multiple complaints about the family, including allegations of sexual abuse, inadequate supervision, poor hygiene, and physical neglect. The Department provided ongoing services to the family, such as counseling for the parents and the children, parenting education, after-school programs for the children, and financial assistance.

In June 2014, T.L. jumped off the roof of the family's home. Father testified that he was at work when T.L. jumped off the roof. After the incident, father quit his job as a loss prevention officer to stay home and supervise T.L.

After participating in services for years, the family's situation had not changed or improved. Dr. Maxey, a counselor involved with the family from October 2014 until June 2015, found father willing to talk about the issues; however, he was "very brittle and defensive."

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] Mother's four other children also lived with them. Father is not the biological parent to those four children.

- 2 -

Father never expressed any desire to work on issues with mother's other four children and the family unit.[3]

In October 2015, father was diagnosed with chronic fatigue syndrome, which caused him to have difficulty with daily activities, such as dressing, bathing, and fixing dinner. He was bedridden for approximately two years. As a result, mother was the main caregiver for the children.

On September 29, 2017, the Department received a complaint about deteriorating conditions in the home. A counselor had been visiting the home in August and September 2017, and found trash, dog feces, and clutter throughout the home. The counselor testified that rotten fruit was in baskets by the front door and kitchen, and when she entered the front door, "a cloud of fruit flies" hit her in the face. At first, the counselor tried working with, and encouraging, mother to clean the house.[4] However, by September 29, 2017, the condition of the home had not improved. The kitchen had rotten food on the table and counters. The children's bedrooms contained rotten food, dirty diapers, and dirty clothes, and the mattresses were urine-stained. The toilet in the children's bathroom did not work, and mother would not let them use her bathroom. The children went to the bathroom in the sink or on the floor. The Department removed the children on October 2, 2017.[5] The parents minimized the conditions of the home to the social workers.

After T.L. entered foster care, however, the Department required the parents to improve their support system, maintain contact with the Department, participate in outpatient counseling,

---

[3] Father told the counselors and social workers that he primarily was concerned about T.L. and that the other four children were mother's children.

[4] Father stayed in his bedroom while the counselor visited.

[5] T.L. was six years old at the time of the removal. Mother's other children were eight years old, nine years old, twelve years old, and thirteen years old.

participate in marriage counseling, clean the home and keep it in a safe condition, participate in parent engagement services, participate in supervised visitation, address physical health issues, and resolve transportation issues. The Department wanted mother and father to accept responsibility for their actions and apply what they had learned to their daily lives.

The Department provided additional support services for mother and father. The Department offered parent engagement services, supervised visitation and outreach counseling, financial assistance, individual counseling, and marriage counseling. In mid-December 2017, mother and father moved to a mobile home. Clutter built up in the mobile home, despite counselors encouraging the parents to clean and organize. The Department did not visit the mobile home because the parents had not progressed to the point where T.L. could visit or return to the home.

Dr. A. James Anderson conducted psychological and parenting evaluations of mother and father in 2013 and 2018.[6] Dr. Anderson found that father's depression was "much stronger" in 2018 than in 2013, and his capacity to meet the children's needs had diminished. Dr. Anderson opined that father was "focused internally and . . . preoccupied mentally with his own physical condition," which limited his "emotional availability" to the children. In 2018, father scored in the "at-risk range on the risk assessment instrument for child physical abuse," whereas in 2013, he scored in the "low risk range." Dr. Anderson doubted that father would have any "therapeutic gains" because father had had "quite a few interventions, extended experience with treatment and

---

[6] Dr. Anderson was concerned that he did not see more improvement with mother between 2013 and 2018, and in fact, some things had "gotten worse over that period of time." Dr. Anderson recommended treatment "for an indeterminate period of time . . . to keep things from deteriorating, getting out of hand." Furthermore, in 2018, mother scored in the high risk range on the risk assessment instrument for child physical abuse, whereas in 2013, she scored in the low risk range.

[Dr. Anderson] did not see any more improvement, and in fact did see some lost ground as far as his emotional and behavioral functioning."

Throughout the years, the parents blamed others for their situation and rarely took responsibility for their actions. The Department noticed that father used his diagnosis of chronic fatigue syndrome as an excuse, instead of trying to determine how to meet T.L.'s needs despite his diagnosis. Father appeared to comprehend what the service providers told him to improve his situation, but "there was never any forward motion in terms of action."

From October 2017 through May 2018, the Department offered weekly supervised visitation between the parents and the children. Father missed one visit when he was sick.[7] Before the visitations, a licensed professional counselor offered parenting skills education to mother and father. The counselor also worked with the parents on budgeting, organization, time management, transportation issues, and referrals to food banks and other social services. At times, father recognized some of the problems, but he lacked the motivation to fix them. The parents had never progressed to having increased visitation or home visits, and despite all of the services provided, they had not improved their situation. In fact, at times, the parents could not meet their own basic needs, such as having food in the home, attending appointments, and having reliable transportation, and they never demonstrated an ability to meet the needs of the children who have special needs.

In June 2018, the Department stopped the visits because one of mother's children alleged sexual abuse by a relative and the parents had not shown any progress. Mother and father avoided any accountability, but acknowledged that they knew about previous allegations of sexual abuse and did not know how to handle it. In September 2018, the Department petitioned to have mother's and father's parental rights terminated.

---

[7] Mother came to all of the visits.

Beginning in September 2018, father started occupational therapy and physical therapy, so that he could learn to "tolerate increased activity and improve his endurance." According to the physical therapist assistant, father made "a little progress."

Beginning in October 2018, mother and father met with a licensed clinical social worker for ten, one-hour sessions because of the stress and depression due to the Department's removal of their children. The counselor found the parents to be "honest and open" and motivated toward reuniting with their children.

On January 8, 2019, the Campbell County Juvenile and Domestic Relations District Court (the JDR court) terminated father's parental rights.[8] Father appealed the JDR court orders to the circuit court.

On April 15 and 16, 2019, the parties appeared before the circuit court. The Department presented evidence that T.L. was a "very bright[,] precocious little boy." When he came into foster care, T.L. had issues with bed-wetting and nightmares. The Department referred him to counseling, and by the time of the circuit court hearing, he was "very well adjusted." T.L.'s foster parents expressed a desire to adopt him.

At trial, father accepted responsibility for the conditions of the home when the children were removed. Father testified that his physical condition had improved and that he was "functioning at a much higher level" than he was in October 2017. He wanted T.L. to be returned to his care, but acknowledged that it was not "feasible" for all five children to return to his and mother's care.[9]

---

[8] The JDR court also terminated mother's parental rights, and she appealed to the circuit court.

[9] Mother testified that at the time of the removal, she was depressed and overwhelmed with caring for the children and father. Mother wanted all five children to be returned to her care, but was not in a position to care for all of them at the time of the circuit court hearing.

After hearing all of the evidence and argument, the circuit court terminated father's parental rights under Code § 16.1-283(B) and (C)(2).[10] This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Father argues that the evidence was insufficient to support the termination of his parental rights under Code § 16.1-283(B) and (C)(2). He notes that in the foster care plan filed on July 20, 2018, the Department changed their foster care goal to adoption "just nine months after the removal of [T.L.]." The Department petitioned for termination of father's and mother's parental rights in September 2018. Father argues that he "was not given an opportunity to show that he had effectively remedied [the] conditions which led to the removal of [T.L.]."

Father, though, appealed the JDR court's rulings to the circuit court. "A party appealing to a circuit court has the right to a *de novo* trial on appeal from 'any final order or judgment of the juvenile court affecting the rights or interests of any person coming within its jurisdiction.'" Alexander v. Flowers, 51 Va. App. 404, 413 (2008) (quoting Code §§ 16.1-296, 16.1-136). "A

---

[10] The circuit court also terminated mother's parental rights to all five of her children under Code § 16.1-283(B) and (C)(2). Mother appealed the circuit court orders. See Lynn v. Campbell Cty. Dep't of Soc. Servs., Record Nos. 0955-19-3, 0956-19-3, 0957-19-3, and 0958-19-3.

trial *de novo* in the circuit court 'annuls the judgment of the [juvenile court] as completely as if there had been no previous trial . . . and . . . grants to a litigant every advantage which would have been [available to the litigant] had the case been tried originally in [the circuit] court.'" Id. (quoting Fairfax Cty. Dep't of Family Servs. v. D.N. and S.N., 29 Va. App. 400, 406 (1999) (alteration in original)). "Once the trial *de novo* commences in the circuit court, the district court *judgment* is annulled, *and is not thereafter available for any purpose*." Id. at 414 (quoting Turner v. Commonwealth, 49 Va. App. 381, 386 (2007) (emphasis in original)).

When father appeared before the circuit court, the JDR court's ruling had been annulled. At that point, father had been given approximately nine months' notice of the Department's intention to change the goal to adoption and terminate his parental rights, and T.L. had been in foster care for approximately eighteen months. Father had months to prepare for the circuit court hearing and prove that he could care for T.L., but he failed to do so. "Code § 16.1-283(C)(2)'s twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" Thach, 63 Va. App. at 171 (quoting L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56 (2003)).

Father further contends that his home situation and his medical condition had improved by the time of the circuit court hearing and that he had "made significant and substantial progress in remedying the conditions which led to the removal of [T.L.]." He and mother had moved to a new home and kept it clean. He had obtained physical and occupational therapy to improve his endurance and mobility. Father emphasizes that he participated in all of the Department's required services.

The circuit court terminated father's parental rights under Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Toms, 46 Va. App. at 271 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63 (2003)).

A parent needs to do more than simply participate in the Department's services; he needs to have substantially remedied the conditions that led to the child's removal or continued placement in foster care. Here, the circuit court found that father had "significant issues" and that the Department had provided him "a lot of services." The circuit court found that the condition of the home when T.L. was removed was "horrible." The circuit court noted that the parents argued that their current home may be clean now, but no children were living there.

The circuit court had an opportunity to see and hear the witnesses. It found the Department's witnesses to be credible and was "persuaded by the multiple witnesses," who testified that mother and father had made "minimal progress." "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness' testimony." Layman v. Layman, 62 Va. App. 134, 137 (2013) (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*)).

"This Court is bound by the credibility findings of the circuit court." <u>Tackett v. Arlington Cty.</u> <u>Dep't of Human Servs.</u>, 62 Va. App. 296, 339 (2013).

The Department had been involved with the family since 2012 and offered them numerous services over the years. All of the children were in counseling. At the time of the circuit court hearing, T.L. had been in foster care for approximately eighteen months, and the parents admitted that they were not in a position to have all five children come home. Although mother and father advocated for T.L. to return to their care, they had never progressed to the point of having unsupervised or overnight visitations with him.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." <u>Id.</u> at 322 (quoting <u>Kaywood v. Halifax Cty. Dep't of Soc. Servs.</u>, 10 Va. App. 535, 540 (1990)).

Based on the totality of the evidence, the circuit court did not err in terminating father's parental rights under Code § 16.1-283(C)(2). "When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." <u>Kilby</u> <u>v. Culpeper Cty. Dep't of Soc. Servs.</u>, 55 Va. App. 106, 108 n.1 (2009); <u>see also</u> <u>Fields v.</u> <u>Dinwiddie Cty. Dep't of Soc. Servs.</u>, 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating father's parental rights pursuant to Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

<u>Affirmed.</u>